IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs November 1, 2016

## CEDRIC MIMS v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 12-02286          Paula L. Skahan, Judge**
_____

**No. W2016-00418-CCA-R3-PC  -  Filed February 24, 2017**
_____

The Petitioner, Cedric Mims, appeals the denial of his petition for post-conviction relief in which he challenged his convictions of felony murder, especially aggravated robbery, and attempted voluntary manslaughter and his effective sentence of life in prison.  On appeal, the Petitioner contends that he was denied his right to the effective assistance of counsel.  We affirm the post-conviction court's denial of relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and J. ROSS DYER, JJ., joined.

James A. Greene, Memphis, Tennessee, for the appellant, Cedric Mims.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Sam Winnig, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTUAL AND PROCEDURAL HISTORY

#### Trial

The facts underlying the Petitioner's and his co-defendant's convictions were summarized by this court on direct appeal as follows:

Defendants Allen Craft and Cedric Mims were convicted of first degree felony murder, especially aggravated robbery, attempted voluntary manslaughter, and employing a firearm during the commission of a dangerous felony. The trial court sentenced each defendant to life for the felony murder conviction, with concurrent sentences of twenty years for the especially aggravated robbery conviction and two years for the attempted voluntary manslaughter conviction.

….

Tekela Phillips Rayford testified that her family owned Phillips Sundry, a grocery store on Vance Avenue in Memphis, and that her cousin, Ronald Ellington, worked at the store as a cook. Rayford requested that Ellington keep her company and protect her while she was at the store alone. On December 3, 2011, Rayford received a phone call informing her that Ellington had been shot and killed and that two other people also had been shot at the store.

Officer Trey Norris of the Memphis Police Department responded to the shooting at Phillips Sundry. He was informed that three victims had been shot, and two of them were lying on the ground beside a white SUV when Officer Norris arrived. A blood trail led officers to the third victim's residence, an apartment complex several streets away. The officers learned that the third victim had returned to the scene, and all three victims had been transported to the hospital.

James Hendricks, the victim in the attempted voluntary manslaughter judgment, testified that he grew up near the scene of the shooting. At 1:00 p.m. on December 3, 2011, Hendricks rode his bicycle to Phillips Sundry, where he saw his friends, Herman Robinson and Ronald Ellington, sitting in Robinson's white Dodge Durango in front of the store. He noticed two young men standing on the corner, one who appeared to be 5'7" to 5'9" tall and about 17 or 18 years old, and both were wearing gray hoodies, purple bandannas, and blue jeans. The young man with the darker complexion had his hands in the pocket of his hoodie as he walked around to the driver's side of Robinson's vehicle. Hendricks reached for his pistol, and the young man suddenly opened fire on Hendricks with what appeared to be a .40 caliber pistol. Hendricks was shot twice and fell, and a friend picked him up and took him to his mother's house one block away. As he was leaving, Hendricks heard two or three more gunshots. When Hendricks

arrived at his mother's house, she took his gun and told him to go back to the scene, where he told police what had happened.

Herman Robinson, the victim in the especially aggravated robbery judgment, testified that, on December 3, 2011, he went to Phillips Sundry and parked his truck in the driveway. He was joined there by his "best friend," Ronald Ellington. Subsequently, two young men wearing bandannas approached his truck, pointed guns, and demanded money. Robinson told them he did not have any money. The "dark guy" then opened the door, pulled Ellington out of the vehicle, and took him to the back of the truck. The "little short guy" kept his gun pointed at Robinson and pulled him out of the vehicle. The shorter man kept demanding money, so Robinson emptied his pockets and gave him $46 while the man kept his large pistol pointed at Robinson. Robinson said he heard one gunshot, turned around to see Ellington fall to the ground, and then heard another gunshot. Realizing he had been shot in the leg, Robinson fell to the ground. He identified Defendant Mims as the man who shot him.

Keith Austin, Ronald Ellington's cousin, testified that on December 3, 2011, he was driving down Fourth Street when he saw the defendants crossing the street on the side of Phillips Sundry. They told him that Ellington had been shot. At the scene, Austin saw that Robinson had been shot in the leg and Ellington in the chest. He saw the defendants standing on the sidewalk and asked what they had just done. One "reached down like he had something," so Austin drove off in fear that he had a gun.

Afterwards, Austin and his cousin, Larry Perry, got in Austin's other car and started looking for the defendants. When they found Defendant Mims talking to a woman at a bus stop, Austin displayed a gun and told Mims to get in the car. Mims told him that he did not shoot anyone but admitted that he participated in the robbery. They attempted to take Mims back to the police on the scene, but Mims escaped. As he struggled to escape, Mims' pants, containing a garbage bag and $40, came off, all of which Austin gave to the police.

Romedarrious Humphrey testified that he knew both defendants from the neighborhood and that, on the day of the shooting, he saw the defendants with Melvin Bridgewater. Defendant Mims told Humphrey, "[M]an, we fixing to go rob and lay these folks down in front of the store." One of the defendants was wearing a gray jacket and the other a black jacket. The defendants left and when they returned, their faces were

covered with bandannas and they proceeded to walk to Phillips Sundry, where they approached Robinson's truck. Humphrey saw Defendant Craft run to the driver's side, pull the driver out of the truck, and shoot him in the leg. Defendant Mims opened the passenger side door and shot the passenger in the chest. Humphrey heard about five gunshots and waited to run to the victims until the defendants had fled the scene.

Prior to the shooting, Humphrey had hidden his .40 caliber pistol underneath a bag of leaves because the police were conducting searches in the neighborhood, and he later discovered that the gun was missing. He asked Defendant Craft about the gun, and Craft replied, "[Y]eah, I got it." Humphrey testified that Defendant Mims belonged to the Kitchen Crips gang and that Defendant Craft belonged to the Grape Street Crips gang.

Sergeant Joe Stark testified that Defendant Mims told him that he was a member of the Goon Squad gang and that Bridgewater wanted to initiate him into the Kitchen Crips gang. Mims said that Bridgewater told him that because he had been taking care of Mims, Mims had to do something in exchange and threatened to kill him if he did not do so. Bridgewater then told Mims that he wanted him to rob someone who owed him money.

On December 3, 2011, Bridgewater took Mims and Craft for a ride to find the man he wanted them to rob. He pointed out a man who was walking two dogs, saying that the man had received a $1500 check and should have cash in his pocket. Bridgewater then took the defendants to another neighborhood, where he got out of the car, returned carrying a black bag, and handed a nine-millimeter pistol to Mims and a .40 caliber pistol to Craft. Mims said that Bridgewater put bleach on the bullets before putting them back in Craft's gun and told Mims that his gun was not loaded.

Bridgewater and the defendants then started looking for the intended victim again and found his vehicle parked in front of Phillips Sundry. Bridgewater directed the defendants to approach the vehicle from different directions. Mims said he was scared and did not want to do it, but Craft put a bullet in his chamber and told him, "[M]an, I got your back." They walked up to the passenger side of the car and "put a gun" on the passenger. Craft walked around to the driver's side, opened the door, and pulled the driver out of the truck. Mims was "patting the driver down to see if he had anything" when the passenger suddenly tried to escape. He said Defendant

Craft caught the passenger and then he heard gunshots. The driver grabbed Mims' wrist, causing his gun to discharge.

Defendant Mims then ran across the street to where Bridgewater had been watching from the gate. Bridgewater told him to go to his "baby mama's house," which Mims did. When Bridgewater arrived at the house, he gave them new clothes and made them wash their hands with bleach.

Defendant Mims told Sergeant Stark that Defendant Craft had stolen $50 and that Bridgewater had given him $40. Mims was later talking to his girlfriend when Perry suddenly pulled up, got out of the car with a gun pointed at him, and told him to get in the car. Another man then hit Mims in the back of his head and put him in the car. They wanted to know where Craft was and threatened to kill Mims if he did not tell them. While they were driving around, Mims jumped out of the car window and ran away, losing his pants in the process.

Defendant Mims said that Defendant Craft was responsible for shooting Ellington. Mims admitted that, during the robbery, he wore a gray jacket, black hat, black bandanna, black gloves, black jeans, and black shoes and that Craft wore a black hoodie, purple bandanna, blue jeans, and white Air Force Ones shoes.

Defendant Mims said he heard Defendant Craft fire thirteen to fourteen gunshots and saw him shoot the man[] with whom he had been fighting[] in the chest and stomach area. Mims said that he was scared of Bridgewater because he had threatened to kill him if he did not commit the robbery.

Sergeant Israel Taylor testified that he and Sergeant Robert Scoggins interviewed Defendant Craft on December 7, 2011. Craft said that Bridgewater made him commit the robbery and that Mims shot Ellington. When they first saw the victim, Bridgewater handed Craft a pistol and threatened to shoot him if he did not go get the money from the victim. Then, as they approached the truck, Mims walked to the driver's side, opened the door, and asked the driver where the money was. The driver started wrestling with Mims over his gun. Mims shot the driver and then the passenger, who had run … over to the driver's side to help the driver.

Defendant Craft said that he was wearing a tan and black hoodie, blue jeans, and Air Force Ones shoes during the robbery and that his face

was covered with a black rag. He recalled that Defendant Mims was wearing a gray jacket, a black hat, and a purple rag wrapped around his face.

Defendant Mims testified that he was fifteen years old when he joined the Goon Squad gang, of which Bridgewater was the leader until he joined the Kitchen Crips gang. Bridgewater was also known as "Melbo the Beast" because he was a "dangerous guy to be around." He started taking care of Mims by providing him with shelter, clothes, and food. Mims explained that Bridgewater took care of many young men because they would do anything he asked in exchange for his protection.

Bridgewater told Mims that Ellington owed him money and that he needed Mims and Craft to get the money for him. When Mims told him that he did not want to rob Ellington, he told Mims that he did not have a choice and that if he did not do so, Bridgewater was going to "take care of [him]," meaning he was going to shoot him. Mims knew he was capable of doing so because Bridgewater had previously shot two other people.

Defendant Mims said that, on December 3, 2011, Bridgewater came to the house where Mims was staying and told him to get into his car, threatening to kill him if he did not comply. Bridgewater handed him a nine-millimeter pistol while he wiped down another gun with bleach. He told the defendants that Ellington had been paid $1500 and that he owed him money. As the defendants approached the victim's vehicle, Bridgewater was watching them as he carried a .357 Magnum pistol in his hand. Bridgewater threatened to kill Mims if he did not rob Ellington. Mims opened the driver's side door and asked where the money was. The driver said he did not have any money, and Mims told him, "I ain't playing." The driver then gave Mims $40. Mims looked up and saw a man pointing a gun at him, telling him to drop his gun. The driver then reached for Mims's arm, and Mims fired a shot. Mims said that "everything went out of control and we were wrestling and tussling." Mims then fled the scene.

Dr. Miguel Laboy, who performed the autopsy on Ellington, testified that he had a gunshot wound to the right side of his chest, which exited his back left side. The cause of death was a gunshot wound to the chest.

*State v. Allen Craft and Cedric Mims*, No. W2013-01822-CCA-R3-CD, 2014 WL 5107036, at *1-4 (Tenn. Crim. App. Oct. 10, 2014).

## Post-Conviction Hearing

Trial counsel testified that he hired an investigator to investigate the facts of the case. He said he knew that the Petitioner was "learning disabled," "had trouble reading," and was a juvenile at the time of the crimes. Trial counsel stated that the Petitioner was evaluated and was deemed competent. Trial counsel believed the Petitioner's "best option" was to testify "given that there was duress that an older[,] tough gang member had recruited these young men to commit this crime." Trial counsel said he did not seek to sever the trial between the Petitioner and his co-defendant because both of them had consistent stories regarding "the older gang member" who "order[ed] them to commit this crime."

Trial counsel testified that the fourth element of duress is "that the defense is not available if the outcome of the crime clearly outweighs the harm attempted to be avoided by going along with that crime." He stated that he hoped that if the defense presented this theory to the jury, they would empathize with the Petitioner, considering his young age and "the accidental nature of the shooting," and convict him of an offense other than first degree murder. Trial counsel characterized the Petitioner as "very sympathetic," "thin," "slow," and "having a hard life." Trial counsel testified that he did not consider hiring an expert witness to assist with his duress defense, explaining that he did not believe such an expert was available.

On cross-examination, trial counsel testified that he had been practicing law for eighteen years and that his practice was "almost exclusively criminal defense." He stated that he is "frequently appointed to handle multi-codefendant cases involving registered or alleged gang members" and that he has been appointed to cases involving juveniles whose cases had been transferred to criminal court. Trial counsel testified that "duress [is] a common defense when it comes to gangs and juveniles." He confirmed that at the time of the trial and the post-conviction hearing, he was unaware of an expert witness who could assist with a duress defense. He said he informed the Petitioner that the Petitioner would either have to maintain the accuracy of his statement to the police or "admit that what was in [his] statement to the police was a lie." Trial counsel acknowledged that the Petitioner admitted to firing a gunshot and then running across the street while his co-defendant continued shooting. Trial counsel confirmed that the Petitioner told police officers, "I was scared of Melvin [because] he told me he [was going to] kill me if I didn't do it and he had a gun on his hip. He was standing[] watching us do it. That's why I did it.…" At trial, Sergeant Stark read the Petitioner's statement into evidence. Trial counsel testified that he hoped the Petitioner's statement to the police and age would garner sympathy from the jury. Trial counsel stated that he believed the statement would be more beneficial since it was made without the presence of counsel. When asked why the defense did not prevail, trial counsel opined that the

jury likely did not believe the defense or that "they were just sick of crime and sick of gang members and sick of senseless killings."

The Petitioner testified that he met with trial counsel before trial and informed trial counsel that he could not read or write and that he was attending "Resource Classes in high school." The Petitioner said he and trial counsel discussed whether to seek to suppress his statement and that trial counsel told him that the statement was unlikely to be suppressed because it matched well with his co-defendant's statement. The Petitioner stated that he informed the police officers that Melvin Bridgewater attempted to kill him and testified that he followed Mr. Bridgewater's orders because he was afraid of Mr. Bridgewater.

The only issues in this appeal are whether trial counsel failed to present adequate evidence to support a jury determination on the defense of duress and whether trial counsel was also ineffective for "not contesting any of the elements of the state's proof." We accordingly summarize only the post-conviction court's relevant findings. The post-conviction court noted that this court

> held that a reasonable trier of fact could have concluded that Petitioner's statement to the police about his fear of harm from Bridgewater was self-serving, did not credibly show that Petitioner could not have withdrawn, and that the threat of harm to Petitioner was not sufficiently severe to outweigh society's interest in preventing robberies and violence to other persons.

The post-conviction court found that the "Petitioner is not entitled to relitigate this previously-determined issue in a post-conviction proceeding." The post-conviction court also found that because the Petitioner did not call an expert witness to testify on the subject of duress, the post-conviction court was unable to "determine what the testimony of other witnesses would have been, whether it would have been favorable to the defense, or whether it would have affected the outcome of Petitioner's case."

## ANALYSIS

On appeal, the Petitioner argues that trial counsel was ineffective by failing to present sufficient evidence for the defense of duress, including failing to obtain an expert witness to testify as to the potential influence of Mr. Bridgewater on the Petitioner. The State contends that the Petitioner did not satisfy his burden because he failed to produce evidence to support his claim of ineffective assistance of counsel. We agree with the State.

To obtain post-conviction relief, the Petitioner bears the burden of proving the allegations of fact in the petition by clear and convincing evidence. T.C.A. § 40-30-110(f). The findings of fact made by a post-conviction court are conclusive on appeal unless the evidence preponderates against them. *Ward v. State*, 315 S.W.3d 461, 465 (Tenn. 2010). Legal issues and mixed issues of fact and law are reviewed de novo without any presumption of correctness. *Vaughn v. State*, 202 S.W.3d 106, 115 (Tenn. 2006).

The Post-Conviction Procedure Act provides relief when a conviction or sentence is "void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. Both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee the right to counsel, and the denial of the effective assistance of counsel is a proper ground for post-conviction relief. *Vaughn*, 202 S.W.3d at 115-16. The right to counsel "encompasses the right to 'reasonably effective' assistance, that is, assistance 'within the range of competence demanded of attorneys in criminal cases.'" *Pylant v. State*, 263 S.W.3d 854, 868 (Tenn. 2008) (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).

To show that relief is warranted on a claim of ineffective assistance of counsel, the Petitioner must establish both that counsel's performance was deficient and that the deficiency prejudiced the defense. *Finch v. State*, 226 S.W.3d 307, 315 (Tenn. 2007). Failure to show either deficiency or prejudice precludes relief. *Felts v. State*, 354 S.W.3d 266, 277 (Tenn. 2011). Deficiency can be shown by proving that counsel's acts or omissions were so serious that they fell outside an objective standard of reasonableness under prevailing professional norms. *Vaughn*, 202 S.W.3d at 116. "Upon our review of counsel's performance, 'we must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time.'" *Finch*, 226 S.W.3d at 316 (quoting *Howell v. State*, 185 S.W.3d 319, 326 (Tenn. 2006)).

To establish prejudice, the Petitioner must show a reasonable probability that, but for counsel's errors, the results of the proceeding would have been different. *Vaughn*, 202 S.W.3d at 116. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *State v. Honeycutt*, 54 S.W.3d 762, 768 (Tenn. 2001) (quoting *Strickland*, 466 U.S. at 694).

The defense of duress is available to a defendant

> where the person or a third person is threatened with harm that is present, imminent, impending and of such a nature to induce a well-grounded

apprehension of death or serious bodily injury if the act is not done. The threatened harm must be continuous throughout the time the act is being committed, and must be one from which the person cannot withdraw in safety. Further, the desirability and urgency of avoiding the harm must clearly outweigh the harm sought to be prevented by the law proscribing the conduct, according to ordinary standards of reasonableness.

T.C.A. § 39-11-504(a). In his brief, the Petitioner highlighted that the defense of duress was impracticable for the felony murder charge that he faced because the harm that he sought to avoid, his death, did not "clearly outweigh the harm" that he ultimately caused, the death of the victim, characterizing the defense as not likely to succeed. Nevertheless, the Petitioner asserts that trial counsel was deficient by not providing more evidence to support a jury determination of duress and by not obtaining an expert witness to testify as to the extent of Mr. Bridgewater's influence over the Petitioner. Specifically, he argues that trial counsel was deficient for failing to provide sufficient proof that the threatened harm was "present, imminent, impending and of such a nature to induce a well-grounded apprehension of death or serious bodily injury if the act is not done," that "[t]he threatened harm [was] continuous throughout the time the act [was] committed," and that the Petitioner was unable to "withdraw in safety." *Id*. § 39-11-504(a).

Our review is limited to "those facts established by the evidence in the trial court." T.R.A.P., Rule 13(c). Likewise, "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Although indigent petitioners are not entitled to funding for expert witnesses in non-capital post-conviction cases, a petitioner "must still provide some evidence as to what testimony could have been presented and how it would have aided his defense." *William Darryn Busby v. State*, No. M2012-00709-CCA-R3-PC, 2013 WL 5873276, at *14 (Tenn. Crim. App. Oct. 30, 2013) (citing *Davis v. State*, 912 S.W.2d 689, 696-97 (Tenn. 1995); *Brimmer v. State*, 29 S.W.3d 497, 512 (Tenn. Crim. App. 1998)).

The Petitioner argues that trial counsel should have obtained an expert witness on the issue of duress. The Petitioner, however, failed to carry his burden because he neither produced expert witness on duress to testify at the post-conviction hearing nor introduce evidence on what an expert witness may have "presented and how it would have aided his defense." *William Darryn Busby*, 2013 WL 5873276, at *14. We are, therefore, unable to hold that trial counsel was deficient for failing to obtain an expert witness or that any deficiency resulted in prejudice.

Although the Petitioner argues that trial counsel failed to produce sufficient evidence to substantiate a duress defense, the Petitioner did not present any proof at the post-conviction hearing to support his claim. Without supporting evidence provided by the Petitioner, we are unable to hold that trial counsel was deficient for failing to present additional proof for the duress defense. In fact, the Petitioner's statement to the police that was introduced at trial was supporting evidence of duress because it described how Bridgewater stood by with a gun on his hip watching the robbery and threatened to kill the Petitioner if he did not participate in the robbery. Additionally, we note that several times throughout the Petitioner's brief, the Petitioner recognizes the strength of the State's case against him and the difficulty, if not near impossibility, of succeeding on a duress defense in this case. Further, the Petitioner testified that he "was scared of Bridgewater because he had threatened to kill him if he did not commit the robbery." *Allen Craft and Cedric Mims*, 2014 WL 5107036, at \*3. The jury was free to weigh the Petitioner's testimony and to determine whether Bridgewater's threat outweighed the harm that resulted from the murder of the victim.

## CONCLUSION

Based on the foregoing analysis, we affirm the judgment of the post-conviction court.

_____
JOHN EVERETT WILLIAMS, JUDGE